LOUIS VICTOR ET AL. *v.* UNITED STATES

**No. 6753.**—Invoices dated Havana, Cuba, June 1943, etc.
Certified June 1943, etc.
Entered at Miami, Fla., June 30, 1943, etc.
Entry No. M–2758, etc.

(Decided January 13, 1947)

*John F. Kavanagh* for the plaintiffs.

*Paul P. Rao,* Assistant Attorney General (*Dorothy C. Bennett* and *Richard F. Weeks,* special attorneys), for the defendant.

COLE, Judge: These appeals for reappraisement concern the export value, section 402 (d) of the Tariff Act of 1930 (19 U. S. C. § 1402 (d))—there being no contention for foreign value by either party—of hard candy and chocolate exported from Havana, Cuba, and entered at Miami, Fla., between May' 1943 and December 1943. Entry was made at the invoice values, i. e., 15 cents per pound for the hard candy and 16 cents per package of two bars for the chocolate. The hard candy was appraised at 21 cents per pound in all instances, except one where it was appraised at 18 cents per pound. The chocolate was appraised at 26 cents per package in some instances and 28 cents per package in others.

Defendant's brief correctly defines the issues presented in the case as "(1) Whether the weight of the evidence sustains the entered values or the appraised values. (2) Whether the appeal for reappraisement should be dismissed."

Question (2) is answered in the negative in the same brief wherein counsel states:

On the other hand, if the Court hold with the plaintiffs, the question of law has been adequately discussed in *Agruba Trading Co.* v. *United States,* R. D. 6104, March 15, 1945, and *Florea & Co.* v. *United States,* R. D. 5907 and 5908, 11 Cust. Ct. 377, 384; R. D. 6190, July 12, 1945.

The writer deems it fair to advise the Court that after studying the opinions in the cited cases, he is constrained to agree that the motion pending should be denied if it is passed upon.

I accept this admission as sufficient to dispose of the motion, for it should be denied.

The first important and decisive question is addressed to the facts. I proceed therefore to analyze and deposit the evidence in the appropriate scales. This operation results in a clear preponderance of one over the other.

The United States appraiser at Miami testified that his appraisement of all of the merchandise in question was based entirely on a Treasury Department report (collective exhibit 16). Before said

report was offered, the customs official, who prepared it, gave preliminary testimony, outlining his qualifications and relating his experiences in making the investigation upon which his report is based. He is a certified public accountant and has been in the Government service for approximately 18 years, of which 2 years were spent as an assistant customs agent and 6 years as a customs examiner, his present position being in the office of the appraiser at the port of New York. His inquiries in the foreign market regarding the merchandise in question were made pursuant to a special assignment "to conduct a Treasury Department investigation as to market values in Cuba." To acquire the data embodied in his report, eight visits were had with Enrique Roca, the Cuban shipper of the merchandise under consideration. Enrique Roca "spoke English very well," and "we had our conversations in English." At first, he showed only copies of commercial invoices which agreed with the consular invoices. Later, and after further inquiry, he produced a ledger carrying accounts of the importers of the instant merchandise, but showing only dates and total amounts of shipments, without any record of payments. At a subsequent visit, Roca admitted that "the invoices he prepared—that is the consular invoice and the commercial invoice—which he sent to his importers and the copies of the commercial invoices which he showed me were false. He said they were not the correct prices, and he suggested that if I go up to his office again he would tell me the actual prices paid" (R. 149). At a still later visit, Roca "took from his desk very small pieces of paper, scraps of paper I would say, with writing on them, and told me that those were the real records of his business with these importers" (R. 149, 150).

Photostat copies of the "scraps of paper" referred to are embodied in the report (exhibit 16, *supra*) as exhibits A, B, C, and D to substantiate charges of allegedly fraudulent practice. The report charges that "Consular invoices were fraudulently prepared and fraudulent commercial invoices agreeing with the false consular invoices were furnished importers to corroborate the consular invoices," all of them "showing the purchase price of hard candies at $0.15 per pound and of chocolate at $0.16 per package of two bars, while the actual purchase price of hard candies was $0.21 per pound and of chocolates $0.26 per package of two bars up to and including consular invoice No. 8690, and $0.28 per package of two bars on consular invoice No. 11633 and thereafter."

Further allegation is made of a "conspiracy to defraud the customs," claim being made that the shipper, Enrique Roca, and an agent, J. Antonio Prieto, who negotiated the importations in question, arranged, with understanding from the importers, Mart Haller and Louis Victor, for the alleged false invoicing, as above outlined.

As verification of allegedly fraudulent practice, as charged, the report seeks to explain said exhibits A, B, C, and D, as follows: Exhibit A reflects "the true details of shipments No. 2 to 9 (first series)" from Enrique Roca to Mart Haller. Exhibit B is "a photostatic copy of a memorandum prepared by Roca at the time shipments No. 9–15 inclusive were liquidated." Exhibit C is "a photostatic copy of a liquidation of Victor's account covering the first six shipments prepared by Prieto and Roca in Miami." Exhibit D is "a photostatic copy of Roca's original calculations."

The construction sought of these so-called scraps of paper cannot be applied because of the lack of explanatory comment on them. As they appear herein, they are merely a collection of computations. True, the report offers a meaning for some of the figures, but such vague and indefinite copies of mere slips of paper are wholly inadequate in form to receive probative value. The conclusion by the witness as set forth in his report cannot be accepted as supplying that omission.

Stripped of all matter relating to the contention of fraudulent practice, the report contains the following information: Enrique Roca manufactured most of the hard candy included in the shipments in question. Some of the hard candy was made by Jiminez, Fernandez y Cia for the said Roca who "advanced money and materials and paid $0.11½ per pound for the candy." The chocolate was manufactured by different companies for Roca, according to his specifications. Havana is the principal market for such merchandise, and "there is no concession in prices, terms or discounts, because of quantities purchased." "All orders were verbal" between the shipper and the importers, plaintiffs herein. "Enrique Roca does not have a price list. He stated that he freely offered the hard candy and chocolate manufactured for him by others to all purchasers in the United States through his selling agent, J. A. Prieto, Miami, at the same prices, namely: Hard candies—$0.21 per pound. Chocolate—$0.26 per package of 2 bars up to September 2, 1943, and $0.28 thereafter." The cost of packing is included in unit prices. The agent, said Prieto, receives a commission of 5 per centum and 1 per centum.

The Government's report and the testimony of the official who prepared it have been detailed not only because such evidence sets forth the basis for the official appraisement, but also because of sharp contradictions existing between defendant's proof and plaintiffs' line of evidence, consisting of oral testimony and documentary proof in the form of affidavits and accounting records. A summary of plaintiffs' proof follows.

The importations by Mart Haller were made after he contacted Enrique Roca, through J. Antonio Prieto who, "as a salesman for his cigar company" had called at Haller's place of business. Concerning the proposal to pay Prieto a commission for his activity, Mr. Haller

made the following explanation: "Mr. Prieto and I discussed it and I made the proposition whether he would make it a sales proposition to sell the merchandise and get a 5 per cent commission or make it a partnership with me and we would put the 5 per cent in the business, and he decided he wanted to get into a partnership so there never was any commission paid." The shipments to Mart Haller were made under a written contract (exhibit 1), whereby Enrique Roca agreed to supply between May 1943 and December 1943 "not exceeding 1,000,000 pounds of Hard Candy and Sweet Chocolate" at 15 cents per pound for the hard candy and 16 cents per pound for the sweet chocolate of 7½-ounce bars. Payment for the merchandise was made at the prices set forth in said agreement without any discount, commission, rebate, or gift of any kind. In an affidavit (exhibit 2) executed by the shipper, Enrique Roca, before the American consul at Havana, Cuba, affiant testifies to the existence of the agreement, exhibit 1, *supra*, and that "pursuant to said agreement, I did sell to the said Mart Haller of Miami, Florida, nineteen (19) shipments of said hard candy and sweet chocolate, hereinabove referred to, and did bill the said Mart Haller at the stipulated and agreed price for said candies as herein above referred to."

In July 1943, and after some shipments of this hard candy and chocolate had been received, Mart Haller, in company with said Prieto, went to Cuba to investigate the Cuban export candy market, and met Enrique Roca, who was found to know "very little" English, and who "usually spoke in the Spanish language." The chocolate imported by Mart Haller was a "very cheap" grade, "filled with starch and the cheapest beans, coca beans, were used, and sugar," and was prohibited from being sold in the United States as "chocolate" because it did not meet the specifications of the Pure Food and Drug Administration. It was ultimately relabeled and sold as "candy chocolate."

During 1944, and after entry of the shipments in question, customs agents visited Mart Haller at his place of business where they obtained a copy of the contract, exhibit 1, *supra*, and a tabulation, exhibit 8, showing details, taken from accounting records of the importations in question. Canceled checks (collective exhibit 7) verify actual payment of the amounts set forth on the tabulation, exhibit 8, *supra*.

The nine shipments to Louis Victor are the only importations of hard candy and chocolate ever made by him. The purchases were the outcome of a discussion with Enrique Roca, whose affidavit with letter attached (collective exhibit 11) confirms an agreement "to supply the said Louis Victor with an amount of hard candies and sweet chocolate in accordance with letter attached hereto marked 'Affiant's Exhibit A' for the stipulated price of 15¢ per pound on hard candy and a price of 16¢ per pound on sweet chocolate of 7½ oz. bars, that in

pursuant to said letter, I did sell to the said Louis Victor of Miami, Florida, an amount of said hard candy and sweet chocolate and did bill the said Louis Victor at the stipulated price for said candies as referred to in attached letter."

Cross-examination of the witness, Louis Victor, disclosed that he was a beverage salesman until 1943 when he met Enrique Roca, through the said J. Antonio Prieto, and arranged for the candy shipments under consideration. There was no written agreement concerning the amount of candy to be purchased; it was to be supplied as needed. All conversations with Enrique Roca were "half English and half Spanish," but "I could never carry on a clear conversation with him." Mr. Victor could not recall whether he was present at any of the conferences when the customs agent was checking his business records relating to the importations in question. He could offer no information concerning payments for his imported merchandise, because his wife "was carrying on the financial end of it, taking care of the books."

Mrs. Victor admitted she was a partner with her husband in the candy business, in which capacity she "took care of the books, invoices, shipments, and all stenographic work, all bookkeeping work" (R. 103). She testified that the invoice prices were the prices actually paid for the merchandise, without any discount, commission, or rebate being allowed, and she produced the ledger account of Enrique Roca (collective exhibit 14), as well as canceled checks (collective exhibit 13) representing payments for the imported candy, and a recapitulation sheet (exhibit 15) showing details of the transactions. Recalling a visit by Customs Agent Fortier, the witness stated that she showed him her complete set of bookkeeping records, the ledger and cash journal (exhibit 17), "so he was free to get whatever information he wanted. At that time, if I remember correctly, he only looked at the Antonio Martinez account, although he was free to look at whatever he pleased in the ledger" (R. 115).

The testimony of J. Antonio Prieto corroborates that of previous witnesses insofar as it relates to his association with the importers and the shipper in arranging for the importations under consideration and his ultimate agreement to become a partner with Mart Haller in the candy business in lieu of accepting any commission. He denied having ever received any commission in connection with the shipments under consideration. He was very positive that Enrique Roca speaks English "very poorly." Interrogated by the court on this point, he testified as follows (R. 215):

Judge COLE: Let me ask, Mr. Prieto. You are sure Mr. Roca cannot speak English.

The WITNESS. He speaks English broken. He says a lot of words until he comes to a word he don't know and then he breaks into the conversation in Spanish.

Judge COLE: He doesn't speak English?

The WITNESS: No, sir. I can understand him because when he comes to some word he cannot say he says to me, "How do you say this word", and then I translate it for him.

During a visit to Cuba, the witness obtained affidavits (exhibits 3, 4, 5, and 6) from individuals possessing knowledge of the Cuban export candy market during the period covered by the instant importations. Two of the affiants, exhibits 3 and 6, *supra*, are merchandise brokers, handling candy for clients in the United States. They testify in effect that during the period covered by the shipments in question, Cuban hard candies were sold in wholesale quantities at prices ranging from 10 cents per pound to 15 cents per pound, and that sweet chocolate with a cereal mixture and made in bars of 7½ ounces was so sold at from 14 to 18 cents per pound. The purchaser of Enrique Roca's factory executed the affidavit, exhibit 4, and states that hard candies in lots of 60,000 pounds or more sold at 15 cents per pound, and the price for sweet chocolate with cereal mixture and made into 7½-ounce bars was 14 cents per pound to 16 cents per pound. The candy manufacturer who executed the affidavit, exhibit 5, *supra*, testifies that in lots of 1,000,000 pounds, hard candies sold for 15 cents per pound or less, and sweet chocolate with mixture of cereals made in 7½-ounce bars sold for 16 cents per pound, or less.

Mr. Prieto flatly denied conversations with Enrique Roca, alleged in the Treasury Department report, exhibit 16, *supra*, to the effect that he had conspired with the Cuban shipper with intent to defraud the United States by undervaluing the imported merchandise and preparing fraudulent commercial and consular invoices.

With the view of showing the value of candy, similar to that covered by the shipments under consideration, Eugene A. Jochman, a purchasing agent with 25 years' experience in buying hard candy, including some imported from Havana, Cuba, testified for plaintiffs. During the period covered by the shipments in question, he purchased Cuban hard candy at 13 cents per pound and 13½ cents per pound. He considered the hard candy purchased by him at that time to be superior in quality, "from the angle of public acceptance," to that imported by Mart Haller. Explaining the basis for such an opinion, the witness testified that the hard candy purchased by him was of clear construction, "almost transparent," whereas "This other kind of candy is the very heavily grained, with a heavy coating of sugar and the center is clear. That is less expensive than the almost transparent type of candy."

The customs agents who investigated the invoices covering the entries involved were heard. The first, Mr. Barber, who visited Mart Haller's place of business, testified he had no disagreement with the testimony given by the said plaintiff. The second, Mr. Fortier,

testified that he visited the place of business of Louis Victor in January 1945. Inquiring for the books of account, he received the reply, "'there were no records, they had been out of business and the records had been burned and destroyed and there were no more in existence" (R. 192). On a subsequent visit, the ledger was produced, but at no time was he shown the journal, exhibit 17, *supra*, or the letter, exhibit 12, *supra*, containing the Cuban shipper's statement to sell the imported candy and chocolate at the prices set forth on the invoices. The notes taken by the customs agent from Enrique Roca's ledger account agree with the information contained in the account itself, collective exhibit 14, introduced by plaintiffs.

The United States examiner at Miami who passed some of the importations in question—those made between July and October 1943—testified that he recommended the advanced values adopted by the appraiser from the report, exhibit 16. He admitted that during the period covered by the importations under consideration, other importers in Miami brought in hard candy, similar to that in question, shipped from Cuba by Enrique Roca, and that the invoice values of such shipments were the same as those stated on the invoices covering the present shipments.

Defendant contends that the report, collective exhibit 16, is "entitled to full faith and credit" and should be accepted "to determine the outcome of this litigation," but the record herein does not warrant such controlling influence for that document. First of all, the important "scraps of paper," exhibits A, B, C, and D of said report, hereinabove discussed, fall far short of establishing their intended purpose. Their meager identification in the report does not bring them to the status of showing prices alleged by the Government. Nor does the testimony relating to the investigations made at the places of business of the importers offer any support to defendant's position, as set forth in said report. Furthermore, the financial papers, books, and documents, produced by plaintiffs as records maintained in the ordinary course of business, and so recognized by the customs agents, are not sufficiently identified to establish the soundness of allegations made by defendant.

In their supplemental brief, counsel for defendant, attempting to show the appraised values as the true dutiable values, seek to reconcile canceled checks, ledger sheets, and recapitulations of accounting records, offered by plaintiffs, with the computations set forth on the so-called scraps of paper, exhibits A, B, C, and D of the special agent's report, collective exhibit 16, *supra*.

Discussing the importations of Mart Haller in such light, reference is made to canceled checks and ledger sheets, collective exhibit 7, and a recapitulation sheet, exhibit 8, all admitted in evidence over objection of Government counsel, and without restriction as to their

use "as evidence of anything further than a list prepared by Mr. Haller in his handwriting and given to the government agent in connection with his investigation," as Government counsel had requested. To effect the reconciliation sought between the appraised values and the said checks, ledger sheets, and recapitulation, counsel for defendant argue as follows: invoice quantities are multiplied by the prices (21 cents per pound for the hard candy and 26 cents per pound for the chocolate) claimed by the Government. From the totals thus acquired, deduction is made for commissions of 5 per centum and 1 per centum, and then the amount of shipping expenses or charges is added. The result in *some instances* equals the amount of a canceled check and posting shown on the ledger sheets, said collective exhibit 7, an amount appearing on the recapitulation sheet, said exhibit 8, and the balance obtained through computation as shown on one of the so-called scraps of paper, exhibit A, in the said special agent's report. It is important to note that defendant's analyses, as above outlined, assume payment of selling commissions by the Cuban exporter, which was flatly denied at the trial by plaintiffs' witnesses, and concerning which no mention is made either in the affidavit executed by the Cuban exporter, exhibit 2, or in the contract, exhibit 1, between the importer and the exporter.

Complete reconciliation, in the manner hereinabove outlined, of prices claimed by the Government cannot be established in every instance. Counsel for defendant concede this, for in a discussion of other cases relating to the same importer, Haller, they state that "payments were not made to cover specific or individual shipments but checks were issued in round figures to apply on account," and then further admit that "evidence is lacking" as "to payments or accountings in accord with the appraised values" on five shipments.

Concerning the importations by Louis Victor, defendant admits that "Victor's cancelled checks cannot be reconciled with the consular invoice prices or the prices claimed by the government." Discussing transactions of the said Victor, counsel assume, as they did with importations of Mart Haller, that the foreign exporter paid selling commissions, which was denied in oral testimony introduced by the importer.

To repudiate the evidence introduced by plaintiffs as extensively as the analyses offered in defendant's supplemental brief suggest, is not justifiable. It is true that plaintiffs' line of proof is not altogether satisfying, and that some phases thereof give reason to doubt the merit of certain contentions. However, considering the record as a whole, I find that the preponderance in weight of the evidence supports the values claimed by plaintiffs. Accordingly, I hold export value, section 402 (d), *supra*, to be the proper basis for appraisement

·of the hard candy and chocolate included in the shipments in question, .and that such export values are the entered values.

Some of the invoices involved herein contain an item of guava paste. However, plaintiffs offered no proof concerning such merchandise, .and there is nothing in the official papers to disturb the presumptively correct appraised values, which I therefore hold to be the proper ·dutiable values of the guava paste included among the present importations.

Judgment will be rendered accordingly.